# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

QUINCEY GERALD KEELER, *also known as* JERRY,

    *Plaintiff,*

v.

ARAMARK,

    *Defendant.*

Case No. 11-1372-EFM

## MEMORANDUM AND ORDER

    Plaintiff Quincey Gerald Keeler filed this pro se lawsuit, his seventh, against Defendant ARAMARK alleging twenty-five claims of various, and occasionally fictitious, forms of wrongful termination, defamation, and conspiracy to commit civil wrongs and torts. Both parties moved for summary judgment—or, in the alternative, partial summary judgment—on the twenty claims remaining in Keeler's complaint. The Court grants ARAMARK's motion for summary judgment on all remaining claims because a reasonable jury would necessarily find (1) that ARAMARK made the decision to terminate Keeler before he engaged in protected action and without a retaliatory motive, and (2) that Keeler cannot prove all elements of his claims of defamation and civil conspiracy.

## I. Factual and Procedural Background[1]

Defendant ARAMARK HSS provides food, nutrition, linen, and environmental services to healthcare facilities, including Wesley Medical Center ("WMC") in Wichita, Kansas. Plaintiff "Jerry" Keeler was hired by ARAMARK in January 2006 as a Food Service Worker at WMC. Keeler occupied this position with ARAMARK until his termination on January 27, 2011.

In 2008, Keeler commenced the first of what was to be a series of unsuccessful lawsuits against ARAMARK, alleging that ARAMARK committed various unlawful acts against Keeler during the course of his employment.[2] On December 1, 2010, Keeler delivered documents to Jeanne Doege, the Human Resources Manager for WMC and ARAMARK at WMC. The documents included a letter addressed to WMC and ARAMARK and several "Alligator Complaints."[3]

It appears from the documents that Keeler believed ARAMARK was retaliating against Keeler's legal actions by declining to offer him overtime shifts and by not featuring him as an "Employee of the Month." The letters have a hostile tone, which is exacerbated by the fact that

---

[1] In accordance with summary judgment procedures, the Court has set forth the relevant, uncontroverted facts from each parties' motions. Because Keeler labeled several of ARAMARK's factual assertions as either "denied" or "admitted" with further explanations, but failed to provide an on-point reason for the disputes, the Court will relate all facts that were not properly contested in addition to those facts that Keeler labeled as uncontroverted.

[2] The previous actions were listed by ARAMARK and include: "One before the Honorable Monti L. Belot, entitled *Keeler. v. ARAMARK*, Case No. 08-1168-MLB, filed on June 8, 2008, one before the Honorable Monti L. Belot, entitled *Keeler v. ARAMARK*, Case No. 09-1356-WEB-DWB filed November 13, 2009, one before the Honorable David Waxse, entitled *Keeler v. Neubauer, et al*, Case No. 10-1129-JTM-DJW filed April 26, 2010, one before the Honorable J. Thomas Marten, entitled *Keeler v. ARAMARK Healthcare Support Services, LLC*, Case No. 10-1358- JWL-KGG filed October 18, 2010 (Case No. 10-1129 and 10-1358 were consolidated on February 24, 2011) and one before Honorable J. Thomas Marten, entitled *Keeler v. ARAMARK*, Case No. 11-cv-01372-EFM-KGG filed November 18, 2011." Def.'s Notice of Related Action, Doc. 7, at ¶ 1. Judge Marten had placed filing restrictions on Keeler for filing vexatious, frivolous suits against ARAMARK, but permitted the present action to proceed because Keeler presents the foregoing issues for the first time and because "Keeler specifically represents that 'This is the last and final KEELER VS. ARAMARK case.'" Mem. & Order Granting Leave to Proceed *In Forma Pauperis*, Doc. 4, at 2.

[3] *See* Doege Decl., Ex. 3, Doc. 32-12.

Keeler wrote them in all capitals. Keeler repeatedly threatens to "expose" WMC for allegedly including his social security number on a document accessible to the public on PACER. Keeler also says that "there will constantly be problems" at work so long as he feels he is being mistreated.[4] Keeler goes so far as to state that his family and friends will "start a riot with the blacks on the north side of town" if Keeler were to suffer any adverse physical symptoms brought on by stress, which Keeler attributes wholly to WMC and ARAMARK.[5] Finally, the documents are interspersed with ominous language informing WMC and ARAMARK that "this is [their] final warning."[6]

Doege forwarded the December 1, 2010, documents from Keeler to Anita Clearman, the Human Resources Manager for ARAMARK. Clearman says that she felt "shocked and scared for the safety of employees at the WMC facility" when she read Keeler's letters.[7] Keeler was placed on paid administrative leave on December 2, 2010, while ARAMARK began an investigation into his letters. Keeler responded by sending ARAMARK and WMC two more letters in early December that mirrored the threats contained in the December 1 documents, including the following exclamations in large, bolded type: "ANYWAY BY DEC 21, 2010 FOR HACA and ARAMARK. IM READY, LETS GO DO IT! IF YOU WANT."[8]

As part of the investigation, on December 7, 2010, Clearman interviewed witnesses at WMC, including Doege and Keeler's supervisors, Diana Porter and Mai Vu. All three stated that

---

[4] *Id.* at 2.

[5] *Id.* at 16.

[6] *Id.* at 13.

[7] Clearman Decl., Doc. 32-2, at ¶ 8.

[8] Clearman Decl., Ex. 3, Doc. 32-4, at 7.

they were afraid of Keeler and intimidated by his behavior. Clearman also interviewed WMC's Human Resources Director, who said that she viewed Keeler as a threat to the hospital, its patients, and its employees.

On December 10, 2010, Clearman interviewed Keeler over the phone, asking questions about the threatening statements Keeler made in his December 1, 2010, letter. Clearman felt that Keeler was neither forthcoming nor cooperative in his answers. When she asked about Keeler's threats of riots, Keeler initially responded, "'Aint't nobody going to do nothing without my say-so.'"[9] Clearman did not tell Keeler that others had said they felt threatened by him.

On December 15, 2010, Clearman and others, including ARAMARK's attorneys, conducted a conference call to discuss the outcome of Clearman's investigation. During the call, the participants agreed to terminate Keeler's employment. By January 2, 2011, ARAMARK had obtained the necessary approvals to terminate Keeler's employment. Due to safety concerns, Clearman was not willing to ask Keeler to return to WMC to receive notice of his termination in person. Instead, ARAMARK decided to mail a termination letter to Keeler to inform him that his employment had been terminated. Between January 4 and 27, 2011, ARAMARK and its legal counsel drafted the language of Keeler's termination letter.

On January 19, 2011, Keeler filed an amended charge against ARAMARK with the Kansas Human Rights Commission ("KHRC"). The KHRC mailed a notice of Keeler's complaint with a letter dated January 20, 2011, to ARAMARK, which became aware of the charge on January 24, 2011. ARAMARK signed and mailed Keeler's termination letter on January 27, 2011. The letter states that Keeler was terminated for cause based on his (1) refusal

---

[9] Clearman Decl., Doc. 32-2, at ¶ 16.

to cooperate in investigations, (2) repeated demands that management employees be fired or demoted, (3) threats of riots on WMC's premises, (4) "decision to continually skirt the line of ARAMARK HSS employee guidelines," and (5) intimidation of others.[10]

Keeler alleges that he was terminated in retaliation for filing his January 19, 2011, charge with the KHRC. ARAMARK asserts that it terminated Keeler due to his threatening and intimidating letters sent in December 2010. ARAMARK further asserts that it took the same action against four other employees who were terminated in 2011 for threatening or intimidating employees on ARAMARK premises.

After exhausting his administrative remedies with the KHRC and EEOC, Keeler filed a complaint in this Court asserting 25 claims against ARAMARK for alleged violations of Title VII of the Civil Rights Act of 1964 and the Kansas Act Against Discrimination (KAAD). These claims are mostly duplicative. Condensing Keeler's claims, it appears that claims one through twelve allege that Keeler was wrongfully terminated as an act of retaliation. Claims thirteen through seventeen were dismissed with prejudice by a joint stipulation between the parties.[11] Claims eighteen and nineteen accuse ARAMARK of defamation. Claims twenty through twenty-three charge ARAMARK with committing the "intentional tort" of wrongful termination, and claims twenty-four and twenty-five accuse ARAMARK of "conspiracy to harm employment."

ARAMARK contends that Keeler's termination could not have been an act of retaliation because the decision was made before Keeler filed his KHRC charge. ARAMARK also asserts that it never published Keeler's termination letter or the reasons for his termination, and

---

[10] Reitmeyer Decl., Ex. 2, Doc. 32-19, at 2.

[11] Stipulation of Dismissal, Doc. 27.

therefore did not defame Keeler. Furthermore, ARAMARK argues that a company cannot conspire with itself.

## II. Analysis

Both parties now move for summary judgment. Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[12] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[13] The movant bears the initial burden of proof, and must show the lack of evidence on an essential element of the claim.[14] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[15] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[16] The Court will not grant summary judgment "where there is reason to believe that the better course would be to proceed to a full trial."[17]

### A. Retaliatory Discharge (Claims 1–12)

In his first twelve claims, Keeler alleges that ARAMARK violated Title VII and the KAAD when it terminated him eight days after he filed a discrimination charge with the KHRC. Keeler's claims are essentially an accusation of retaliatory discharge. Title VII makes it

---

[12] Fed. R. Civ. P. 56(c).

[13] *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[14] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[15] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[16] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[17] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII]."[18] A plaintiff may prove a Title VII retaliation claim in one of two ways. Under the "mixed-motive" theory, the plaintiff can offer direct proof "that retaliatory animus played a 'motivating part' in the employment decision."[19] If the plaintiff can prove that retaliatory animus was a contributing factor to the employment decision, then the employer must prove that it would have taken the same action absent the retaliatory motive.[20]

Absent direct proof of discrimination, the plaintiff must rely on the tripartite *McDonnell Douglas* framework to prove a retaliatory animus.[21] First, the plaintiff carries the initial burden of establishing a prima facie case of retaliation.[22] To establish a prima facie case for retaliation, a plaintiff must show "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."[23] Causality can be shown through circumstances that create an inference of retaliation, such as when an employer's adverse action closely follows an employee's exercise of protected

---

[18] 42 U.S.C. § 2000e-3(a).

[19] *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1225 (10th Cir. 2008) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989)).

[20] *Id.*

[21] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1972). Claims brought under Title VII and the KAAD are subject to the *McDonnell Douglas* burden-shifting analysis. *See Land v. Midwest Office Tech., Inc.*, 114 F. Supp. 1121, 1139 (D. Kan. 2000).

[22] *Adamson v. Multi Community Diversified Servs., Inc.*, 541 F.3d 1136, 1145 (10th Cir. 2008).

[23] *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F. 3d 1193, 1202 (10th Cir. 2006).

conduct.[24] If the plaintiff meets the initial burden of proof, the burden then shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions.[25] If the defendant presents such a reason, the burden returns to the plaintiff who must show that the defendant's stated reason is a pretext for discriminatory intent.[26]

A plaintiff need not state at the outset of his case whether he intends to prove a mixed-motive or pretext case of retaliatory discharge. But at the summary judgment stage, the plaintiff must present evidence of a genuine factual dispute as to whether retaliation was a motivating factor or whether the employer's stated reason for termination is unworthy of belief.[27] In this case, Keeler must show that a reasonable jury could find either (1) that ARAMARK terminated his employment as a retaliatory measure in response to the January 19 KHRC charge, or (2) that ARAMARK's stated reasons for terminating Keeler are pretext for a retaliatory animus. Because the Court cannot find in the record any direct evidence that ARAMARK's decision to terminate Keeler was motivated by a retaliatory animus,[28] the Court will treat Keeler's claims as pretext arguments subject to *McDonnell Douglas*.

Keeler established a prima facie case of retaliatory discharge. He showed that he engaged in protected action when he filed his January 19, 2011, charge with the KHRC. ARAMARK took employment action that was adverse to Keeler when it decided to fire him.

---

[24] *See O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001).

[25] *McDonnell Douglas*, 411 U.S. at 802–03.

[26] *See Elmore v. Capstan, Inc.*, 58 F.3d 525, 529–30 (10th Cir. 1995) (citing *EEOC v. Flasher*, 986 F.2d 1312, 1316 (10th Cir. 1992)).

[27] *See Fye*, 516 F.3d at 1225.

[28] *See id.* at 1226 (finding that the plaintiff could not prove a mixed-motive case when her termination letter did not reveal any explicit or implicit retaliatory motive).

And the fact that Keeler was terminated eight days after he filed his KHRC charge—and only three days after ARAMARK was made aware of the charge—creates an inference of causality between the two events.[29]

But ARAMARK has asserted several legitimate, neutral reasons for Keeler's termination, as well as evidence to show that *the decision* to terminate Keeler was made before Keeler filed his KHRC charge on January 19, 2011. "To prevail on a retaliatory discharge claim, a plaintiff must establish that *the decision* to terminate [him] resulted from a retaliatory animus."[30] In other words, it is the proximity between the employee's protected conduct and the employer's decision to take adverse action, rather than the date the adverse action actually occurred, that is relevant when analyzing causation.

Here, although Keeler was terminated on January 27, 2011, the record shows that ARAMARK decided to terminate Keeler on December 15, 2010. A declaration and e-mail from one of ARAMARK's Associate General Counsels, George Gowen, confirms that ARAMARK made the decision to terminate Keeler on December 15, 2011.[31] Clearman prompted Gowen for an update on the situation on December 27, 2010.[32] On January 2, 2011, Gowen replied that he had spoken with others and they were "clear to proceed" with Keeler's termination.[33] ARAMARK's outside counsel prepared the first draft of the termination letter and e-mailed it and the following message on January 4, 2011: "All, as many of you are aware, the decision has

---

[29] *See Argo*, 452 F.3d at 1202 (finding that twenty-four days between the protected activity and adverse employment action was sufficient to infer a causal connection).

[30] *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 549 (10th Cir. 1999) (emphasis added).

[31] Gowen Decl. & Ex. 1, Docs. 32-15, 32-16.

[32] Gowen Decl., Ex. 1, Doc. 32-16.

[33] *Id.*

been made to terminate Mr. Keeler, and I have drafted a termination letter for your review and comments, as well as for thoughts on who should sign it."[34] According to a declaration from Associate General Counsel Charles Reitmeyer, the draft letter went through several revisions over the next few weeks.[35] Reitmeyer signed and dated the final letter on January 27, 2011.[36] Therefore, the Court finds that ARAMARK made the decision to terminate Keeler on December 15, 2010—more than a month *before* Keeler filed his EEOC charge.

Keeler questions the authenticity of ARAMARK's timeline due to the six-week gap between the time ARAMARK decided to terminate Keeler and the date they mailed his termination notice. Given that ARAMARK had a draft termination letter prepared on January 4, more than two weeks before Keeler filed his KHRC charge, this delay does not give rise to an inference of retaliation.

The record is replete with support for the reasons ARAMARK stated in its letter as the basis for Keeler's termination. First, numerous employees provided written testimony that they were frightened of Keeler. Doege affirmed that she was afraid for her own safety and that of others who worked in and visited WMC.[37] Clearman stated that she "felt that Mr. Keeler was becoming increasingly unstable."[38] Keeler's manager, Diana Porter, stated in an affidavit, "Due to the swift changes in [Keeler's] mood and anger at ARAMARK HSS and many of his managers for management decisions they made, I worried about [the Shift Leaders'] safety

---

[34] *See* Reitmeyer Decl., Ex. 1, Doc. 32-18.

[35] Reitmeyer Decl., Doc. 32-17 at ¶ 4.

[36] *See* Reitmeyer Decl., Ex. 2, Doc. 32-19.

[37] Doege Decl., Doc. 32-9, at ¶ 12.

[38] Clearman Decl., Doc. 32-2, at ¶ 9

working with him alone." Indeed, Shift Leader Mai Tsi Vu testified that she felt threatened and intimidated by Keeler, was too scared to issue written warnings to him, and would ask security to escort her to her car after working a shift during which Keeler lost his temper.[39]

Despite his arguments to the contrary, Keeler was made aware of the fact that at least one employee found him threatening. Clearman describes an event in which one of Keeler's co-workers felt threatened after she found Keeler's driver's license in her locked car. An incident report from WMC Security confirms Clearman's affirmations and further relates that this employee "had been having problems with [Keeler] for a while" and spoke with the police about stalking.[40] The employee also submitted a letter to Human Resources regarding the incident in which she stated that Keeler made her and her co-workers uncomfortable.[41] A record of a meeting between Keeler and his supervisors regarding the aforementioned incident contradicts Keeler's assertions that he was never disciplined or warned about intimidating his co-workers prior to his termination.[42]

Keeler also argues that ARAMARK's stated reasons for his termination are untruthful because his termination letter stated that Keeler "continually skirt[ed] the line of ARAMARK HSS employee guidelines," but did not specifically enumerate the objectionable behavior. But Keeler's disciplinary record shows that he was counseled by his supervisors for deficient cash handling procedures on three occasions.[43] Keeler was certainly aware of this record because he

---

[39] Vu Decl., Doc. 32-14, at ¶¶ 3, 5.

[40] Clearman Decl., Ex. 4, Doc. 32-6, at 2–3.

[41] Clearman Decl., Ex. 5, Doc. 32-7, at 4.

[42] Clearman Decl., Ex. 6, Doc. 32-8.

[43] Doege Decl., Ex. 3, Doc. 32-12, at 21.

included it in his December 1, 2010, "grievance" to WMC and ARAMARK.[44] Furthermore, Diana Porter submitted an affidavit attesting that she, Doege, and WMC security met with Keeler about loitering around WMC in places he was not supposed to be.[45]

Keeler also attempts to counter ARAMARK's neutral reason for his termination by arguing that termination was an overly harsh form of discipline. The aforementioned incidents show that, contrary to Keeler's assertions, Keeler was warned about inappropriate behavior and offered an opportunity to improve. Furthermore, ARAMARK's employee handbook, which Keeler acknowledged that he understood,[46] classifies "threatening or coercing persons associated with any ARAMARK or Hospital (to include employees, supervisors, patients, visitors, students, etc.)" as a Group III Offense, for which "a first occurrence normally should warrant removal."[47] Therefore, Keeler's termination was foreseeable and consistent with company policy.

Keeler also appears to alter the arguments in his complaint to now assert that ARAMARK decided to terminate Keeler because the letters he sent in December 2010 threatened that he would take protected actions against ARAMARK, or alternatively, constituted protected action in the form of an internal grievance. Even if the Court were to grant Keeler leeway to make these arguments at this point in the litigation,[48] they do not hold water. It is clear

---

[44] *Id.*

[45] *See* Porter Decl., Doc. 32-13, at ¶ 4.

[46] *See* Doege Decl., Ex. 2, Doc. 32-11 (showing a copy of a signed acknowledgment form indicating that the Keeler read and understood the provisions of the employee handbook).

[47] Doege Decl., Ex. 1, Doc. 32-10, at 12.

[48] In the parties' stipulations listed in the Pretrial Order, the parties agreed that "Plaintiff does not allege that Defendant terminated his employment on the basis of any activity other than his filing of the amended complaint with the KHRC/EEOC on January 19, 2011." Pretrial Order, Doc. 30, stipulation 10. Pretrial orders, and the stipulations contained therein, are controlling unless modified by the Court, which will only be done to prevent manifest injustice. Fed. R. Civ. P. 16(d)–(e). Keeler has not requested a modification of the Pretrial Order or made any showing that the order works a manifest injustice.

from the record that the motivation for Keeler's termination was not the fact that he engaged in a protected act, but that he did so in a threatening manner. In other words, it was not the substantive content of his complaint that led to Keeler's termination, but the form in which those complaints were made. This distinction is best represented by an excerpt from Keeler's termination letter: "ARAMARK HSS is fully supportive of its employees' rights to raise complaints in a non-threatening manner. Your behavior, however, is not reasonable and has crossed the boundaries of non-threatening and acceptable conduct."[49]

Keeler repeatedly states in his complaint and as support for his motion for summary judgment that the Kansas Department of Labor found that his termination was wrongful. The Court now clarifies for Keeler that the Department of Labor was *not* investigating whether ARAMARK violated Keeler's civil rights. The Department of Labor was conducting a preliminary determination of whether Keeler had forfeited his right to unemployment benefits by engaging in "conduct that was a violation of a duty or obligation reasonably owed to the employer as a condition of employment."[50] The Department of Labor made no findings regarding the propriety of ARAMARK's termination decision.

For the foregoing reasons, the Court concludes that Keeler has failed to show that a reasonable jury could find that ARAMARK's stated reasons for Keeler's termination were mere pretext for a retaliatory motive. Summary judgment is therefore proper on Keeler's claims of retaliatory discharge.

---

[49] Reitmeyer Decl., Ex. 2, Doc. 32-19, at 2.

[50] *See* Kansas Dep't of Labor Notice of Determination, Doc. 33-2, at 3.

**B.    Defamation (Claims 18 & 19)**

Keeler alleges that the termination letter he received from ARAMARK contains defamatory remarks, particularly those statements regarding Keeler's intimidation of others. Keeler asserts that he has suffered embarrassment because government agencies and this Court have seen the letter, and that he will be harmed when future employers learn of its contents and the reasons for Keeler's termination. Under Kansas law, in addition to proving false words and damages, a plaintiff claiming defamation must prove that the allegedly defamatory words were communicated to a third party.[51] Privilege is an affirmative defense to defamation, and may be either absolute or qualified.[52] Whether a communication is privileged is a matter of law for the Court to decide.[53]

In this case, the parties stipulated in the Pretrial Order that neither party had communicated the contents of the termination letter to anyone other than each other, the KHRC and EEOC, and this Court.[54] Therefore, the only "third persons" to whom the letter was published are the KHRC, EEOC, and this Court. Although there is no direct precedent from the Tenth Circuit stating that communications to administrative bodies and courts are entitled to absolute privilege, such a holding is consistent with Kansas state law.

---

[51] *See, e.g.*, *Bosley v. Home Box Office, Inc.*, 59 F. Supp. 2d 1147, 1150 (D. Kan. 1999) ("In Kansas, the elements of defamation include (1) false and defamatory words (2) communicated to a third person (3) which result in harm to the reputation of the person defamed."); *see also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 12 (1990) ("As the common law developed in this country, apart from the issue of damages, one usually needed only allege an unprivileged publication of false and defamatory matter to state a cause of action for defamation.").

[52] *See Hobson v. Coastal Corp.*, 962 F. Supp. 1407, 1411 (D. Kan. 1997) (citing *Turner v. Halliburton Co.*, 722 P.2d 1106 (Kan. 1986)).

[53] *See Castleberry v. Boeing Co.*, 880 F. Supp. 1435, 1443 (D. Kan. 1995).

[54] Pretrial Order, Doc. 30, at 3.

First, the Kansas Court of Appeals has held that a supervisor's testimony at an unemployment compensation hearing could not be used to demonstrate publication of alleged defamatory statements.[55] And although the court found the point to be moot, it also stated that "[t]o allow plaintiff to use [the supervisor's] hearing testimony to establish the elements of this [defamation] action would defeat the purpose of the absolute privilege for judicial proceedings."[56] The court's statement suggests not only that absolute privilege protects communications to the courts, but also that such privilege should extend to quasi-judicial proceedings like employment-related hearings.

Second, Kansas statutes provide absolute immunity to employers who, when responding to a prospective employer's written request for information about a former employee, provide the prospective employer with either copies of the former employee's written employee evaluations, or information about "whether the employee was voluntarily or involuntarily released from service and the reasons for the separation."[57] If absolute privilege protects the conveyance of an employer's reason for terminating an employee when such information is requested by a prospective employer, surely the same protection applies when the information is produced for an administrative or judicial hearing.

Furthermore, even if absolute privilege did not protect ARAMARK's communication of Keeler's termination letter to the KHRC, EEOC, and this Court, qualified privilege surely applies. Qualified privilege applies when public policy favors the free exchange of information

---

[55] *Batt v. Globe Eng'g Co.*, 774 P.2d 371, 375 (Kan. Ct. App. 1989).

[56] *Id.*

[57] Kan. Stat. Ann. § 44-119a(c).

over the plaintiff's interest in his good reputation.[58] Given that the Petition Clause of the First Amendment protects the right to petition the courts, the Court is certain that public policy outweighs Keeler's concerns about his reputation. To overcome ARAMARK's qualified privilege, Keeler must show actual malice—that ARAMARK knew the statements in the letter were false and made them with the intent to injure Keeler.[59] Keeler has not provided any evidence that a reasonable juror could find that ARAMARK intended to harm Keeler or his reputation. As Keeler repeatedly notes in his briefs, ARAMARK knew that Keeler had filed a KHRC charge before they sent the final draft of the letter. Given their litigious history, ARAMARK must have anticipated a lawsuit like this one. It is reasonable to infer that ARAMARK was simply covering its bases by explicitly laying out the reasons for Keeler's termination, rather than attempting to damage his reputation.

Finally, the Court notes that the publication of the contents of the termination letter through the courts are likewise privileged and cannot constitute communication to a third party.[60] Therefore, the fact that the termination letter and its contents are now available to the public via PACER as a result of this Order cannot form the basis of Keeler's present defamation suit or any future challenges.[61]

---

[58] *See Ali v. Douglas Cable Comm'ns*, 929 F. Supp. 1362, 1384 (D. Kan. 1996) (quoting *Turner*, 722 P.2d at 1112).

[59] *Id.* at 1385.

[60] *See Barr v. Matteo*, 360 U.S. 564, 569 (1959) (holding that judges "are absolutely privileged as respects civil suits to recover for actions taken in them in the exercise of their judicial functions, irrespective of the motives with which those acts are alleged to have been performed, . . . and that immunity extends to other officers of the government whose duties are related to the judicial process").

[61] The Court reminds Keeler that he remains subject to the filing restrictions previously imposed upon him.

For the foregoing reasons, Keeler has failed to demonstrate a genuine factual dispute regarding his defamation claim. The record shows that Keeler cannot prove all of the elements of the claim, entitling ARAMARK to judgment as a matter of law. The Court therefore grants ARAMARK's motion for summary judgment on claims eighteen and nineteen.

C. **"Intentional Tort of Wrongful Termination" (Claims 20–23)**

Keeler's next three claims allege that ARAMARK committed an undefined intentional tort of wrongful termination. The Court knows of no basis for such a cause of action. To the extent that one exists, the Court has already analyzed and rejected Keeler's claims that his discharge was unlawful. Therefore, ARAMARK is entitled to summary judgment on claims twenty through twenty-three.

D. **"Conspiracy to Harm Employment" (Claims 24 & 25)**

Keeler's final two claims allege that ARAMARK conspired to harm his future employment. Liberally construing Keeler's claims as alleging a conspiracy to commit civil wrongs and torts,[62] it remains unclear what civil wrong or tort might encompass "harming employment." Kansas Statutes section 44-117 prohibits employers from preventing a discharged employee from obtaining future employment. But that statute explicitly permits the former employer to "furnish[] in writing, on request, the cause of such discharge."[63]

The Court need not ascertain the precise civil wrong or tort Keeler intends to invoke, however, because Keeler cannot prove that ARAMARK engaged in any conspiracy. Keeler cites a Kansas Supreme Court decision that sets out the elements of a civil conspiracy: " (a) two or

---

[62] *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) ("A pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers.").

[63] Kan. Stat. Ann. § 44-117.

more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof."[64] Keeler alleges that ARAMARK engaged in a conspiracy when its managers and attorneys agreed to fire him on the grounds that he intimidated others and drafted his termination letter indicating as such. ARAMARK argues that summary judgment is proper because a corporation cannot conspire with itself. Both arguments lack merit.

First, ARAMARK's invocation of the intracorporate conspiracy doctrine is misplaced. ARAMARK is correct that, generally, "[t]here is no way that the corporate defendant can be guilty of inducing itself, or 'conspiring' with itself."[65] But the Tenth Circuit has held that the doctrine, which was "designed to allow one corporation to take actions that two corporations could not agree to do,"[66] does not apply to civil rights cases. The Tenth Circuit explained that in civil rights cases, "the action by an incorporated collection of individuals creates the 'group danger' at which conspiracy liability is aimed, and the view of the corporation as a single legal actor becomes a fiction without a purpose."[67] Therefore, in some circumstances, a corporation may be liable for conspiracy to commit a civil rights violation based on the conduct of its individual agents. The present case, however, does not present such circumstances.

Keeler cannot prove that ARAMARK or its employees committed a conspiracy to harm Keeler's employment based on the management's communal decision to terminate him. If the Court were to find that ARAMARK's managers engaged in an unlawful conspiracy by working

---

[64] *Citizens State Bank, Moundridge v. Gilmore*, 603 P.2d 605 (Kan. 1979).

[65] *May v. Santa Fe Trail Transp. Co.*, 370 P.2d 390, 395 (Kan. 1962).

[66] *See Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1127 (10th Cir. 1994).

[67] *Id.* (quoting *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 603 (5th Cir. 1981)).

together as a group to reach a business decision, commerce and industry would cease to exist. More importantly, a conspiracy cannot exist without the presence or intention of an unlawful act. The Court has already found that ARAMARK did not violate any state or federal laws when it terminated Keeler, and that the record does not support Keeler's allegations that ARAMARK acted with retaliatory intent. Therefore, ARAMARK is entitled to summary judgment on claims twenty-four and twenty-five.

**IT IS ACCORDINGLY ORDERED** this 12th day of April, 2013, that Plaintiff Keeler's Motion for Summary Judgment (Doc. 33) is hereby **DENIED**.

**IT IS FURTHER ORDERED** that Defendant ARAMARK's Motion for Summary Judgment (Doc. 31) is hereby **GRANTED**. Judgment shall be entered for the Defendant.

**IT IS SO ORDERED**.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE